# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 20, 2013 Session

## STATE OF TENNESSEE v. CHARLES EDWARD WAGNER

**Appeal from the Criminal Court for Knox County**
**No. 90902      Jon Kerry Blackwood, Judge**

---

**No. E2012-01144-CCA-R3-CD - Filed January 8, 2014**

---

Following a jury trial, appellant, Charles Edward Wagner, was found guilty of the following offenses: aggravated criminal trespass; two counts of aggravated assault; five counts of aggravated kidnapping; one count of especially aggravated kidnapping; one count of false imprisonment; and one count of kidnapping.  The trial court imposed concurrent sentences of eleven months, twenty-nine days each for aggravated criminal trespass, false imprisonment, and assault;[1] four years each for both counts of aggravated assault; ten years each on the five counts of aggravated kidnapping; nineteen years for especially aggravated kidnapping; and four years for kidnapping.  Appealing his convictions and effective nineteen-year sentence, appellant raises the following issues: (1) ineffective assistance of counsel; (2) sufficiency of the convicting evidence; and (3) errors with regard to sentencing. Following our careful review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Mark Stephens, District Public Defender; Jamie Niland, Assistant District Public Defender (on appeal); Randall E. Reagan (at sentencing and motion for new trial); and Tommy K. Hindman (at trial); Knoxville, Tennessee, for the appellant, Charles Edward Wagner.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]  Appellant pleaded guilty to misdemeanor assault prior to the trial.  Thus, although the jury did not return a verdict on this count, the trial court sentenced appellant for assault at the sentencing hearing on the remaining charges.

**OPINION**

**I. Facts**

This case involves three separate incidents involving offenses committed by appellant against victims Sylvia Wagner and her then-boyfriend, William "Bill" Hardy. The first incident, which occurred on July 14, 2008, resulted in appellant's being charged with the assault of Mr. Hardy, to which appellant pleaded guilty. The July 17, 2008 incident formed the basis for the charge of aggravated burglary, also involving Mr. Hardy. The third incident on August 4, 2008, led to appellant's being charged with three counts of aggravated assault of Mr. Hardy, four counts of especially aggravated kidnapping of Ms. Wagner, and four counts of aggravated kidnapping of Ms. Wagner.

**A. Facts from Trial**

The State's first witness was Michael Mays, the 9-1-1 records manager. Through Mr. Mays, the State introduced recordings of one 9-1-1 call placed on July 14, 2008; one call placed on July 17, 2008; and five calls placed on August 4, 2008.

Ed Johnson, an officer with the Knoxville Police Department forensic unit, testified next. Officer Johnson responded to the scene at West High School and photographed various pieces of evidence that were arranged on the hood of a Ford van. The items included: a cellular telephone, gloves, a mask, an identification card, a wallet, a knife, a flashlight, a taser, a camera, and a stick. He also took photographs of Ms. Wagner at the University of Tennessee Medical Center.

On cross-examination, Officer Johnson confirmed that other officers had already arranged the items on the hood of the van and that he neither collected nor took custody of the items. He had no personal knowledge of where each item was found or by whom the items were found. He did not attempt to lift fingerprints from the interior of the van or look for fibers in the van. He did not know if any other officer had done so.

The State called Jason Ware as its next witness. On August 4, 2008, Mr. Ware left his home to drive to a grocery store. As he was driving, he observed a man later identified as appellant "forcibly" taking a female across the street. Mr. Ware described that appellant held the victim, later identified as Ms. Wagner, in a "headlock" and was walking with a stick in his other hand. Appellant was wearing dark-colored clothing, and it appeared to Mr. Ware that appellant and Ms. Wagner were emerging from someone's yard and not walking along the street. Mr. Ware dialed 9-1-1 and turned his vehicle around. As Mr. Ware approached the scene again, he entered the parking lot of West High School and shined his headlights on

appellant as he was attempting to force Ms. Wagner into his van. Another truck pulled beside Mr. Ware and positioned itself similarly. They waited for the police to arrive and departed shortly after their arrival. Mr. Ware described the van as a "custom" van that was gold, tan, brown, or cream in color.

Mr. Ware confirmed that he discerned the scene to be an "aggressive situation" and that Ms. Wagner was being dragged or pulled. He stated, "[Appellant] was putting this woman into his vehicle forcibly."

Nickalas Hardy[2] testified that he is Bill Hardy's son, and his grandmother's name is Kathleen Hardy. Sylvia Wagner was his father's fiancé at the time of the trial. In 2008, he, Mr. Hardy, Ms. Wagner, and her son Zack Cagle resided together on Greenleaf Avenue, which was located close to West High School. Nickalas stated that in July 2008, he suffered from torn ligaments in his ankle and required crutches to walk. On July 17, 2008, Nickalas, Mr. Hardy, Ms. Wagner, and Mr. Cagle were present at the home on Greenleaf Avenue. Appellant arrived at the residence and "pound[ed]" on the door, demanding to see Ms. Wagner. Although Ms. Wagner was present, occupants of the home told appellant she was not there. Appellant kicked in the door and "stormed" through the house. Ms. Wagner locked herself in a bathroom. Occupants shouted at him to leave, and after a "minute or two," appellant left the home. Someone called 9-1-1, and police responded after appellant had left.

On August 4, 2008, Ms. Wagner, Mr. Cagle, Mr. Hardy, and Nickalas were at the residence. Mr. Hardy was planning to drive Mr. Cagle and Nickalas to a friend's house to spend the night. Ms. Wagner was going to accompany them. Mr. Hardy was moving the vehicle as the other passengers were preparing to enter the vehicle when appellant ran toward them wearing all black clothing and a mask and carrying a stick. Appellant began hitting Mr. Hardy with the stick as Mr. Hardy attempted to exit his vehicle. Appellant dragged Mr. Hardy out of the vehicle, and after Mr. Hardy was on the ground, appellant continued to strike him. Mr. Hardy attempted to block the blows. Nickalas recalled that Ms. Wagner jumped onto appellant's back to stop him. Appellant turned toward Ms. Wagner and struck her in the jaw, then "grabbed her by her head and started pulling her down the driveway . . . ." He accomplished this by placing Ms. Wagner in a "headlock" and pulling her by her hair. Nickalas stated that appellant yelled that if anyone followed him, he would kill her. Ms. Wagner shouted for everyone to "stay back." Nickalas also saw appellant strike Ms. Wagner in the face.

---

[2] Because two witnesses have the surname "Hardy," we will refer to the younger by his first name, Nickalas. In doing so, we intend no disrespect.

Nickalas and Mr. Cagle remained back and called 9-1-1. Mr. Cagle then ran to a neighbor's house and knocked on the door, but no one answered. He continued to knock on doors in an attempt to obtain assistance. They followed at a distance and could see appellant as he forced Ms. Wagner to walk toward the high school. Appellant then "threw" her into a van. Nickalas was still on the telephone with the 9-1-1 operator. Nickalas saw the van's headlights turn on and told the operator that appellant and Ms. Wagner were about to leave. Police arrived shortly thereafter, before the van could pull away. Officers removed appellant and Ms. Wagner from the van, placed them against the van, and handcuffed them both. The 9-1-1 operator asked to speak with Mr. Hardy, so Mr. Cagle ran back to the residence to take the telephone to Mr. Hardy.

The State's next witness was Kathleen Hardy, Mr. Hardy's mother and Nickalas's grandmother. She testified that on July 14, she had been working and was tired when she arrived home, so she relaxed on the sofa and watched television. She heard a noise coming from her driveway and ran to the door. She found Mr. Hardy bleeding and saying, "'Let me get in, let me get in, I think he's gonna kill me.'" She opened the door, and Mr. Hardy fell into the home. Ms. Hardy dialed 9-1-1. She noticed that Mr. Hardy's face was bleeding.

Ms. Hardy recalled a subsequent incident when she was in her bedroom, and Mr. Hardy said, "'Mama, come in here, he's back again . . . ,'" and asked her to sit in the living room with them. She then heard a loud noise, and appellant kicked in her door. Ms. Hardy stood up and placed herself between appellant and Mr. Hardy. She yelled at appellant to get out of her house. Appellant turned and ran from the house. Police officers responded to the incident.

Ms. Hardy testified about another occasion when she heard a noise in her driveway, and Mr. Hardy, who was again hurt, was trying to get into the house. She knew that a man who was dressed in black took Ms. Wagner against her will. She called 9-1-1 and told the operator that appellant had taken a hostage.

Sylvia Wagner, the victim of all counts of the offenses involving kidnapping, testified next. She stated that she married appellant in 2000 and that appellant moved most of his belongings out of their home in May 2008. Prior to appellant's moving out, she had suffered physical abuse at his hands. She described an incident wherein appellant shoved her against the corner of a dresser, leaving a large bruise on her back. Ms. Wagner stated that she had known Mr. Hardy for twenty-seven years and that they had dated long ago. After she and appellant separated, she began seeing Mr. Hardy again.

Ms. Wagner stated that on July 14, 2008, she drove to Mr. Hardy's home after leaving work. She had just exited her vehicle and was standing outside talking with Mr. Hardy when

-4-

she saw someone approach them from the neighbor's yard. She realized it was appellant, and appellant began hitting Mr. Hardy. Appellant knocked Mr. Hardy to the ground and continued to strike him. Mr. Hardy was attempting to stand up, stumbling, and trying to get into his house. Appellant continued hitting Mr. Hardy and eventually "busted his eye open." Mr. Hardy eventually entered his home, and appellant left.

Ms. Wagner recalled that on July 17, 2008, appellant beat on the door and kicked it in. Appellant entered the home and demanded that she accompany him outside because he wanted to talk with her. She went to the bathroom and locked the door. She could hear Ms. Hardy tell appellant to leave, which he eventually did.

Ms. Wagner testified that on August 4, 2008, she and Mr. Hardy were going to drive Nickalas and her son, Zack, to a friend's house. Mr. Hardy was going to back up the vehicle because it was parked very close to an adjacent vehicle and the passenger side doors were blocked. She heard Nickalas say something and looked to see what he was talking about. She saw appellant dressed in black with a black hood covering his face and carrying a large stick. Appellant began striking Mr. Hardy with the stick as Mr. Hardy attempted to exit the vehicle. Appellant knocked Mr. Hardy to the ground. She yelled for appellant to stop and jumped onto his back, "trying to keep [appellant] from killing [Mr. Hardy]." Ms. Wagner stated that appellant hit her in the head with the stick as he was "slinging" it around to hit Mr. Hardy. Appellant removed Ms. Wagner from his back, placed her in a headlock, grabbed the back of her hair, and dragged her down the street. He also struck her in the jaw. Ms. Wagner screamed at appellant that she did not want to go with him. She stated that she could barely breathe at that point. She recalled that in addition to the large stick, appellant also had a knife.

Ms. Wagner stated that appellant dragged her to the parking lot of West High School where he shoved her toward a van, opened the door, and tried to force her into it. He pushed her in through the driver's side door, and she attempted to escape through the passenger side door. Appellant told her that if she opened the door, he would kill her. Appellant tried to start the van, but police arrived at that time. Officers removed Ms. Wagner and appellant and placed them in separate patrol cars while they gathered information. She was permitted to exit the car after a few minutes. Officers spread out several items on the hood of the van that they had taken from appellant. Ms. Wagner sought medical treatment at the emergency room for the injury to her jaw, and she obtained follow-up care the next day.

On cross-examination, Ms. Wagner denied having spent the night with appellant after they separated. She stated that appellant had come into her home uninvited on more than one occasion and had awakened her in the night by screaming and yelling at her. She also denied

that she and appellant discussed their marriage during the time between his pushing her into the van and police officers' arriving at the scene.

On redirect examination, Ms. Wagner indicated that appellant had pressured her not to appear in court to testify and that the day before she testified, she found a threatening note on her vehicle's windshield. She also clarified that following the first encounter between appellant and Mr. Hardy, appellant scattered her belongings in Mr. Hardy's driveway. After she gathered her things, she drove away, and appellant called her on her cellular telephone. He demanded that Ms. Wagner drive to his father's house and threatened to "run [her] off the road" if she did not comply. She drove to his father's house as instructed, and once there, appellant began "slinging [her] around." She struck her head on a wall, causing a hole in the wall.

William "Bill" Hardy was the State's next witness. He testified that he and Ms. Wagner had dated when they were younger and that they became reacquainted through a chance meeting at a store in 2008. He recounted the events of July 14, 2008, stating that he and Ms. Wagner were in his driveway talking when her "eyes start[ed] getting big . . . ." As he turned to perceive what was happening behind him, he was struck. As Ms. Wagner yelled for appellant to stop, Mr. Hardy attempted to run inside his home. He was on the porch when appellant struck him again, and Ms. Wagner attempted to stop the attack by dragging appellant away from Mr. Hardy. However, appellant caught Mr. Hardy and punched him in the face several times. Kathleen Hardy, Mr. Hardy's mother, opened the door to the house, and Mr. Hardy was able to get inside. The ambulance responded to the scene and transported Mr. Hardy to the hospital. He received stitches over his eye and suffered a fracture to the orbit.

On July 17, 2008, Mr. Hardy recalled that appellant approached the back door, so Mr. Hardy immediately called the police. He gathered his family members, and they sat in the living room with the lights off. Appellant kicked in the door, and Mrs. Hardy stood up and began yelling at appellant. Nickalas also arose from his seat, and appellant left the residence.

Mr. Hardy recalled that on August 4, 2008, around 9:00 p.m., he, Ms. Wagner, Zack Cagle, and Nickalas were about to leave to drive the children to a friend's house. As he backed up the vehicle, he turned around and saw someone dressed all in black with a mask covering his face and carrying a stick. Mr. Hardy tried to exit the vehicle, but appellant struck him in the head with the stick. Mr. Hardy stumbled out of the vehicle and was hit several more times. Ms. Wagner dragged appellant away from Mr. Hardy, but appellant caught him as he was trying to go inside his home and dealt several more blows with the stick. Once Mr. Hardy gained entry to his home, he called the police and explained the urgency of the situation. Shortly thereafter, Mr. Cagle entered the home and informed Mr.

Hardy that the police had apprehended appellant with Ms. Wagner at West High School. An officer arrived and escorted Mr. Hardy to the school. The officer picked up the stick from the ground in front of appellant's van and asked Mr. Hardy if that was the weapon with which appellant struck him, and Mr. Hardy confirmed that it was. Mr. Hardy sought medical attention at the emergency room.

The State called Zack Cagle, Ms. Wagner's son, as its next witness. He explained the events of August 4, 2008, and stated that as Mr. Hardy was backing up his vehicle, appellant ran toward them, dressed in all black and wearing a ski mask over his face. Appellant began to hit Mr. Hardy with a stick that he was carrying, and Ms. Wagner jumped on appellant's back to stop him. Mr. Hardy was able to enter his home, and appellant then struck the victim in the jaw with his fist and grabbed her around the neck. Appellant began walking with Ms. Wagner toward West High School with the stick still in his hand. Mr. Cagle said that it appeared to him that appellant was pulling her hair as they walked. Ms. Wagner was "squirming" and attempting to free herself from appellant's grasp. He and Nickalas, who was on the telephone with 9-1-1, followed behind. Mr. Cagle was scared because he thought he would never see his mother again.

When appellant and Ms. Wagner arrived at the high school parking lot, Mr. Cagle witnessed appellant "throw" her into his van. Ms. Wagner had both of her hands on each side of the door trying to resist appellant, but she was unsuccessful. Mr. Cagle stated that it took "a second" for appellant to start the van, during which time the police arrived. Officers pointed their weapons at the van, ordered the occupants to exit, and placed them against the van. They then questioned each individual in separate patrol cars.

Following Mr. Cagle's testimony, the State rested its case-in-chief, and appellant recalled Mr. Hardy as his first witness. He confirmed that he alleged that appellant assaulted him on two occasions and that following the first assault, he sought and obtained an order of protection against appellant. Less than thirty days later and following the August 4 assault, he requested dismissal of the order of protection, stating that "[they] came to an understanding." Mr. Hardy acknowledged that after the court date at which he obtained the dismissal, he and appellant "stood around and talked for awhile [sic] . . . ." He stated that he asked for the dismissal because he "was afraid of what [appellant] may do if [he] continued to aggravate him, so . . . it was probably stupid of [him] to do, but [he] thought [he] was doing the right thing to protect [his] family." He further said that appellant had told him that he was worried that his daughter would grow up without her father, and because Mr. Hardy reared his daughter by himself, he "connected" with appellant on that point. In addition, Mr. Hardy said he had been taught to "forgive and forget."

On cross-examination, Mr. Hardy agreed that the "piece of paper" did not stop appellant from attacking him on August 4.

Appellant called his daughter, Megan Wagner,[3] as his next witness. She stated that at some point following these incidents, Ms. Wagner approached her at a grocery store and engaged her in conversation with appellant standing nearby. Appellant did not speak to Ms. Wagner and did not look at her. Megan and appellant walked Ms. Wagner to her vehicle at her request and talked with her as she put away her groceries. According to Megan, Ms. Wagner then received a telephone call and said, "That was Bill, he said he was coming down here." Appellant responded, "Tell Bill not to come down here. . . . I don't want no [sic] conflict." Ms. Wagner agreed, and then she and appellant hugged each other.

On a separate occasion, Megan and appellant were shopping at Walmart, and Megan heard Ms. Wagner call her name. They engaged in conversation, and Ms. Wagner began showing her baby pictures of her grandchild. Appellant rounded the corner and saw them talking, then stopped. Ms. Wagner turned to appellant and showed him the photographs, also. After talking about the baby for a short time, the conversation lulled and became "silent and awkward," so Megan suggested that they leave. On neither occasion did Ms. Wagner display any fear or apprehension. Megan described the encounters as "a civil conversation like old friends."

On cross-examination, Megan admitted that although Ms. Wagner treated her nicely "overall," while appellant and Ms. Wagner were married, she had prevented Megan from seeing appellant's side of the family, punished her, made her clean the entire house by herself, and kept her from her friends. Megan mentioned a third encounter with Ms. Wagner when Megan was shopping at Walmart with appellant and her grandmother. She confirmed that appellant would only speak to Ms. Wagner after she spoke to him first.

Megan stated that when she learned that appellant had been accused of these incidents, she asked him why he had done these things. Appellant answered that "he was trying to protect his family." He admitted to her that he had struck Mr. Hardy with a stick, but he did not tell her that he had kicked in his front door, punched the victim, or dragged her down the street in a headlock. Appellant told Megan that after he struck Mr. Hardy, he and Ms. Wagner walked down the street together with his arm over her shoulder. Although she recognized the knife that appellant had carried on August 4 as coming from their home, she was not aware that he had been in possession of it that night.

---

[3] Because of the risk of confusion inherent in referring to a "Miss Wagner" and a "Ms. Wagner," we will refer to Megan Wagner by her first name. In doing so, we intend no disrespect.

Appellant's mother, Dorothy Peacock, was his next witness. She testified that after appellant was arrested, he telephoned her from jail, and as a result, she placed a call to Ms. Wagner and asked her to go see appellant in jail. Ms. Peacock relayed the encounter at Walmart between herself, Megan, appellant, and Ms. Wagner. Ms. Peacock stated that when Ms. Wagner began walking toward them, she walked away, but appellant and Megan remained in place. She could not hear the ensuing conversation, but she did not observe anything unusual about the interaction among the parties during their ten-to-fifteen-minute conversation. Occasionally, Ms. Peacock would see the parties "grin."

On cross-examination, Ms. Peacock stated that appellant told her that he struck Mr. Hardy on July 14 because he saw "Mr. Hardy rubbing [the victim's] butt." She did not know about the July 17 incident wherein appellant kicked in Mr. Hardy's door. Regarding the August 4 incident, appellant told Ms. Peacock that he struck Mr. Hardy in the head with a stick, but he did not tell her that he punched Ms. Wagner in the face, placed her in a headlock, or forced her into the van. Ms. Peacock said that appellant told her he "helped" Ms. Wagner into the van after they walked to the van with his hand on her neck. She also indicated that "it's not unusual for [appellant] to have a pocketknife." When asked if she ever saw bruises on Ms. Wagner during the course of her nine-year relationship with appellant, Ms. Peacock answered, "Not on her." The State asked, "[A]re you saying that you saw some on him?" Ms. Peacock responded, "I most definitely did," and said that the bruises were inflicted by Ms. Wagner.

Appellant called his sister, Kelly Bragg, as his next witness. She testified that approximately two weeks after appellant was released from jail, she arrived at his house and noticed Ms. Wagner's vehicle in the driveway. When she entered the residence, Ms. Wagner and appellant were in the kitchen. Ms. Bragg turned around and left.

Appellant's next witness was John Alan Smith, who had known appellant for over thirty years. Mr. Smith described appellant as being "like a brother." He visited appellant at his home after he was released from jail in August 2008, and Ms. Wagner was present, sitting on a sofa. Mr. Smith stated that there was nothing unusual about the interaction between appellant and Ms. Wagner at that time and that they acted "normally" toward each other. On cross-examination, Mr. Smith denied that appellant had told him the details of the incidents involving Mr. Hardy and Ms. Wagner.

Lawrence Melon, appellant's nephew, was the next witness. He accompanied appellant to deliver Ms. Wagner's vehicle to her "a day or two" after the August 4 incident. At that time, he did not notice anything amiss with Ms. Wagner, and he reported that she joked with him as she always had.

Paul Duncan, appellant's grandfather, was his last witness. He visited appellant a few days after his release from jail. When he arrived around 8:00 or 8:30 a.m., he noticed Ms. Wagner's vehicle parked in appellant's driveway. When he went inside, appellant and Ms. Wagner were seated at the table eating breakfast together. Mr. Duncan drank a cup of coffee and talked with them. As he prepared to leave, he recalled that Ms. Wagner said, "I've gotta go home and get some clothes." He testified that she added that she was sorry that this had happened and that she "'told the policemen that [she] didn't want to press charges[,] but they wouldn't listen.'"

The State called Sergeant Ryan Flores with the Knoxville Police Department as a rebuttal witness. He testified that he prepared the affidavits and signed the warrants as the affiant in this case. After reading the affidavits to the jury, Sergeant Flores read the bond condition, which stated that appellant was to have no contact with the victims or witnesses involved in the case.

On cross-examination, Sergeant Flores acknowledged that he stated in the affidavit that appellant had struck Ms. Wagner in the face with the stick but that no evidence was presented at trial to support that statement. He also confirmed that although appellant was in possession of a knife and a taser at the time of his arrest, there was no evidence that he used either of those weapons during the commission of the offenses.

The State then called Andrew Anderson, who testified that he knew appellant and Ms. Wagner and had worked with them at a wrecker service. He had witnessed bruises on Ms. Wagner "quite a few" occasions. He had also observed her with a black eye a "few" times. Mr. Anderson reported that appellant had explained that he sometimes had nightmares and had awakened from a nightmare and struck Ms. Wagner. He opined that Ms. Wagner was involved in an abusive relationship with appellant, elaborating:

> Well, when somebody has bruises on [her] arms about the size of somebody's thumbs, when somebody has bruises on [her] . . . neck, when [somebody] [has] bruises on [her] face, generally, how can you construe anything other than that? Also, the fact that he's very aggressive and – from what I've seen from him anyway [–] and the fact that he's had numerous altercations with other drivers at the shop, . . . how would you draw that conclusion?

Mr. Anderson stated that during the two years he worked with appellant and Ms. Wagner, "she always had a different bruise somewhere else on her body."

The State recalled Ms. Wagner, who further explained an April 2008 incident of abuse wherein appellant picked her up and "slammed" her into the corner of a dresser. This resulted in a large bruise on her back in the rib area. She also developed blood in her urine, which caused her to seek medical attention. She explained the cause of her injury to her medical providers, and they counseled her concerning the abuse. Ms. Wagner informed them that she and appellant were seeing a marriage counselor and that she had considered leaving him but was not ready to do so at that time. On cross-examination, Ms. Wagner denied having visited appellant at his father's home at any time following the August 4 incident.

Following Ms. Wagner's testimony, the State again rested its case. Following deliberations, the jury returned guilty verdicts as follows:[4] count 2 – aggravated criminal trespass as a lesser-included offense of aggravated burglary; counts 4 and 5 – aggravated assault; counts 6 and 7 – aggravated kidnapping as lesser-included offenses of especially aggravated kidnapping; count 8 – especially aggravated kidnapping; count 9 – false imprisonment as a lesser-included offense of especially aggravated kidnapping; counts 10, 12, and 13 – aggravated kidnapping as charged in the indictment; and count 11 – kidnapping as a lesser-included offense of aggravated kidnapping.

## B. Facts from the Sentencing Hearing

The parties agreed that appellant should be sentenced as a Range I offender. The State advanced the enhancement factors that appellant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range; that appellant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense; and that appellant possessed or employed a deadly weapon, a knife, during the commission of the offense. Tenn. Code Ann. § 40-35-114(1), (5), (9).

Appellant presented Diedre Taylor as a witness, who testified that she met appellant at a nightclub where they previously worked as bouncers. She stated that appellant became "family with" her and was like a big brother. Ms. Taylor testified that although being a bouncer at a nightclub could involve violence at times, appellant preferred to talk with the patrons and attempt to calm them. She also spoke about appellant's familial support of his grandfather, Mr. Duncan. She also stated that appellant's daughter was "number one in his life." Ms. Taylor indicated that based on her relationship with appellant, she did not believe him to be a dangerous person.

---

[4] Appellant pleaded guilty to assault as charged in count 1 of the indictment, and count 3 of the indictment, aggravated assault, was dismissed by the State.

Megan Wagner testified again and stated that appellant was very loyal and hard-working. He ensured that she made good grades, emphasized the importance of education, and provided nice clothes for her. He was very strict, but she had never witnessed him act in violence toward anyone.

Dorothy Peacock also testified again and stated that appellant was a good man and was very helpful to her and her father. She gave an example of appellant's comforting an accident victim on the side of the road while they and officers waited for emergency medical personnel to arrive. She also stated that appellant was a hard worker and that he was not a danger to society.

Appellant presented Paul Duncan as his last witness, who stated that he had reared appellant "on and off" since he was eight years old. Mr. Duncan said that appellant had always been there for him and the rest of the family. He also stated that appellant was a "wonderful person."

Appellant relied on the mitigating factors that appellant's criminal conduct neither caused nor threatened serious bodily injury; that appellant acted under strong provocation; that appellant was suffering from a mental or physical condition that significantly reduced his culpability for the offense; and that appellant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. Tenn. Code Ann.§ 40-35-113(1), (2), (8). In the catch-all provision, appellant argued that he had shown remorse, that he enjoyed a good reputation in the community, that he had good character, that he had a good employment history, that he was a good father, and that he had potential for rehabilitation. *Id.* § -113(13). He also advanced the mitigating factor set forth in the especially aggravated kidnapping statute, that he voluntarily released the victim alive.

The trial court applied enhancement factor one, that appellant had a prior history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, and did not find any mitigating factors. The trial court then sentenced appellant as follows: assault, eleven months, twenty-nine days; aggravated criminal trespass, eleven months, twenty-nine days; two counts of aggravated assault, four years each at thirty percent release eligibility; five counts of aggravated kidnapping, ten years each at one hundred percent release eligibility; one count of especially aggravated kidnapping, nineteen years at one hundred percent release eligibility; one count of false imprisonment as a lesser-included offense of especially aggravated kidnapping, eleven months, twenty-nine days; and one count of kidnapping as a lesser-included offense of aggravated kidnapping, four years at thirty percent release eligibility. The trial court merged several of the convictions, resulting in one judgment of conviction for assault, one conviction for aggravated criminal

trespass, one conviction for aggravated assault, and one conviction for especially aggravated kidnapping. It ordered concurrent sentence alignment, resulting in an effective sentence of nineteen years at one hundred percent release eligibility.


### C. Facts from the Motion for New Trial Hearing

Appellant pursued, among other issues, claims of ineffective assistance of counsel in his motion for a new trial. At the hearing on the motion, his first witness was Jack Lakin, who had been a private investigator for over twenty-two years. Before becoming a private investigator, Mr. Lakin was a police officer with the Knoxville Police Department. Mr. Lakin stated that he recorded an interview with Ms. Wagner during his investigation. During the interview, Ms. Wagner indicated that if appellant would "give her [the] home in Farragut, that she would be okay for this to just go away." Ms. Wagner also made two other similar statements during the interview. Mr. Lakin testified that he included this conversation in a report that he gave to trial counsel.

On cross-examination, Mr. Lakin testified that the interview took place shortly before the trial and that during the interview, Ms. Wagner described the assault. She stated that the assailant used a stick during the assault and that she was "drug up the street and then forced into a vehicle."

Kelly Bragg, appellant's sister, testified that after her testimony in appellant's trial, she remained in the courtroom while Ms. Wagner testified on rebuttal. Ms. Bragg further testified that after Ms. Wagner asserted that appellant shoved her into some furniture bruising her back, Ms. Bragg immediately told trial counsel that she had shoved the victim into a dresser, not appellant. Ms. Bragg testified that she confronted Ms. Wagner at Ms. Wagner's home after her mother told her that Ms. Wagner had scratched appellant on his neck, back, and chest. Ms. Bragg admitted that she "put [her] hands around [Ms. Wagner's] neck and slammed her up against the dresser and the bathroom door and told her, my brother doesn't put his hands on women, but I will if you ever touch him again." Ms. Wagner had a large bruise on her left side from hitting the corner of the dresser. Ms. Bragg testified that the altercation was the same incident that Ms. Wagner testified about at trial but that Ms. Wagner had testified it was appellant who harmed her, not Ms. Bragg. Ms. Bragg stated that after she requested to testify about the incident, trial counsel refused to recall her to testify.

On cross-examination, Ms. Bragg conceded that she had no personal knowledge of what occurred between Ms. Wagner and appellant before she arrived at their home. When asked if she thought it was better for the jury to hear evidence that both she and appellant had

harmed Ms. Wagner, she stated that she was unsure. On redirect, she asserted she thought it was better for the jury to hear the truth rather than a lie.

Trial counsel testified he had been practicing law and specializing in criminal defense for thirty-three to thirty-four years. Trial counsel's trial strategy was to show that appellant was in a "very difficult situation" because his wife was seeing another man. Trial counsel testified that he tried to prove that appellant "felt compelled to try to get his wife back" and that "the actions that he took were those of a man who loved his wife, cared about his wife, [and] didn't want to hurt his wife." To investigate the case, trial counsel hired investigators to locate and interview potential witnesses. Trial counsel stated that he also interviewed some of the witnesses and discussed the relevant facts, trial strategy, and testimony with appellant. Trial counsel further explained that appellant "had a great deal of input and voiced his opinion quite a lot about how he viewed the facts." Trial counsel and appellant ultimately agreed on the trial strategy.

Although trial counsel was unable to recall if he asked Ms. Wagner about her statements to the investigator, he stated that it was his understanding that offers to negotiate were inadmissible at trial.

Following the hearing, the trial court denied the appellant's motion for a new trial by written order. The court stated it was "clear that [trial] counsel adequately prepared for this trial," and it was "clear that the [appellant] concurred in the strategy and tactics of [trial] counsel." The trial court determined that appellant failed to show that trial counsel was ineffective or that appellant disagreed with the strategic decisions of trial counsel.

## II. Analysis

Appellant raises three issues in this appeal: (1) ineffective assistance of counsel; (2) sufficiency of the convicting evidence; and (3) allegations of sentencing errors.

### A. Ineffective Assistance of Counsel

Appellant argues that his trial counsel provided ineffective assistance by: (1) failing to file a motion to sever; (2) consenting that the stick in evidence was a deadly weapon; (3) failing to object when the State questioned a potential juror about her aunt's murder; (4) failing to object to the admission into evidence of a note found on Ms. Wagner's car; and (5) allowing the accumulation of inadmissible evidence to prejudice appellant's defense. The State responds that the trial court properly denied appellant's motion for new trial. We agree with the State.

-14-

1. Standard of Review

As an initial matter, we note that raising the issue of ineffective assistance of counsel on direct appeal is "fraught with peril." *See e.g. State v. Thompson*, 958 S.W.2d 156, 161-162 (Tenn. Crim. App. 1997); *State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992); *State v. Earl Haynes*, No. 01C01-9611-CC-00494, 1998 WL 307949, at *4 (Tenn. Crim. App. June 12, 1998); *State v. Jimmy L. Sluder*, No. 1236, 1990 WL 26552, at *7 (Tenn. Crim. App. Mar. 14, 1990). In *Jimmy L. Sluder*, this court wrote:

> Appellant runs the risk of having the issue denied due to a procedural default, or, in the alternative, having a panel of this [c]ourt consider the issue on the merits. The better practice is to *not* raise the issue on direct appeal under the circumstances. The issue can be subsequently raised in a post-conviction proceeding if the appellant's direct appeal, as here, is not successful.

1990 WL 26552, at *7. However, when ineffective assistance of counsel is raised on direct appeal, the same criteria for review applies as if the claim had been raised by way of a post-conviction petition. *Anderson*, 835 S.W.2d at 608 n.3.

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The trial court's findings of fact are conclusive on appeal unless the preponderance of the evidence is otherwise. *Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997)). However, conclusions of law receive no presumption of correctness on appeal. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of appellant's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975)). When an appellant claims that he received ineffective assistance of counsel, he must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007) (citation omitted). It follows that if this court holds that

-15-

either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

To prove that counsel's performance was deficient, appellant must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). As our supreme court has previously held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Id.* at 315-16 (quoting *Baxter*, 523 S.W.2d at 934-35). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To prove that appellant suffered prejudice as a result of counsel's deficient performance, he "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). As such, appellant must establish that his attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

2. Motion to Sever

Appellant asserts for the first time on appeal that he received ineffective assistance of counsel when trial counsel did not file a motion to sever the offenses that occurred on July 14, July 17, and August 4, 2008. When an appellant raises an issue for the first time on appeal, that issue is waived. *Black v. Blount*, 938 S.W. 2d 394, 403 (Tenn. 1996). Appellant did not argue this issue in his motion for new trial or his amended motion for new trial. In addition, he did not present any additional testimony or argument before the trial court at the

-16-

evidentiary hearing on the motion for new trial. Therefore, appellant's claim of ineffective assistance of counsel due to the failure of trial counsel to file a motion to sever is waived.

### 3. Stick as a Deadly Weapon

The trial court determined that appellant failed to show that trial counsel was ineffective for conceding that the stick was a deadly weapon. We agree with the trial court. During closing argument at trial, trial counsel conceded that the stick was a deadly weapon. After the trial, appellant filed a motion for new trial, and the trial court held an evidentiary hearing. We note that while appellant stated this issue in the motion for new trial and trial counsel testified at the evidentiary hearing, appellant failed to ask trial counsel why he conceded to the stick being used as a deadly weapon. Without counsel's testimony on this issue, we would be forced to speculate about the reasoning behind his decision and whether any prejudice resulted from his actions. *Earl Haynes*, 1998 WL 307949, at *4 (citing *State v. Derenzy Turner and Vernon West*, No. 02C01-9512-CR-00390, 1997 WL 312530 (Tenn. Crim. App. June 11, 1997)).

To prove that counsel's performance was deficient, appellant must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn*, 202 S.W.3d at 116). Trial counsel's concession that the stick was a deadly weapon was reasonable under the prevailing professional norms, and as stated below, this court concludes that the stick was, in fact, used as a deadly weapon. Appellant has failed to show deficient performance.

### 4. Questioning of Potential Juror

The trial court determined that appellant failed to show that trial counsel was ineffective in his questioning of the jurors. We agree with the trial court. During voir dire of the potential jurors, the State asked the jurors whether they or someone they knew had been victims of domestic violence. In response, a potential juror answered affirmatively and indicated that her aunt had been murdered by a boyfriend. Trial counsel did not object. After the motion for new trial was filed, the trial court conducted an evidentiary hearing, and trial counsel testified. However, appellant failed to ask trial counsel why he did not object to the State's inquiries regarding the murder of the potential juror's aunt. As stated previously, the absence of trial counsel's testimony would require us to engage in speculation about counsel's reasoning for his decision and whether any prejudice resulted from his actions. *Earl Haynes*, 1998 WL 307949, at *4 (citation omitted). To constitute effective assistance of counsel, "[d]efense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations." *Finch*, 226 S.W.3d at 315-16 (quoting *Baxter*,

523 S.W.2d at 934-35).  Appellant has failed to prove that trial counsel did not satisfy this standard and, therefore, failed to show deficient performance.

### 5. Objection to the Note

The trial court determined that appellant failed to show that trial counsel was ineffective by failing to object to a note that was found on Ms. Wagner's vehicle.  We agree with the trial court.  Ms. Wagner testified that on the first day of trial she found a note on her car that said, "I'm gonna get you."  She testified that she did not know who wrote the note, and she did not recognize the handwriting.  After the trial, appellant filed a motion for a new trial, and the trial court held an evidentiary hearing.  While appellant stated this issue in the motion for new trial, he failed to ask trial counsel why he did not object to the note being entered as evidence.  Absent trial counsel's testimony on this issue, we will not speculate about the reasons underlying his decision and whether any prejudice resulted from his actions.  *Earl Haynes*, 1998 WL 307949, at \*4 (citation omitted).  Appellant has failed to show that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'"  *Finch*, 226 S.W.3d at 315 (quoting *Vaughn*, 202 S.W.3d at 116).  Accordingly, he has failed to demonstrate deficient performance by trial counsel.

### 6. Cumulative Error

Appellant asserts that the cumulative effect of trial counsel's errors rendered trial counsel's performance deficient.  Specifically, appellant asserts that trial counsel's failure to argue his motion to sever the offenses, object to the questioning of a potential juror during voir dire, his concession that the stick was a deadly weapon, and failure to object to the note found on Ms. Wagner's car amounted to an accumulation of prejudicial error.  The State did not respond to this issue.

This court has previously noted that an appellant must show he received deficient performance on at least one issue before he can successfully claim that his constitutional right to counsel was violated by the cumulative effect of counsel's errors.  *See e.g. Tracy F. Leonard v. State*, No. M2006-00654-CCA-R3-PC, 2007 WL 1946662, at \*21 (Tenn. Crim. App. July 5, 2007); *Leon J. Robins v. State*, No. M2005-01204-CCA-R3-PC, 2006 WL 1816361, at \*20 (Tenn. Crim. App. June 27, 2006).  Appellant did not prove deficient performance; therefore, this issue is without merit.

B. Sufficiency of the Evidence

Appellant specifically contends that there was insufficient evidence to support convictions for counts four, five, six, seven, eight, twelve, and thirteen because all of said counts involve the use of a deadly weapon, and he argues that the stick does not meet the statutory definition of a deadly weapon or that he did not use it as such. We note that appellant does not challenge the sufficiency of the evidence underlying his conviction for aggravated criminal trespass.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

## 1. Especially Aggravated Kidnapping

As indicted in this case, proof of especially aggravated kidnapping must necessarily establish that appellant "knowingly remove[d] or confine[d] [the victim] unlawfully so as to interfere substantially with the [victim's] liberty" and that he accomplished this offense "with or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon."[5]  Tenn. Code Ann. §§ 39-13-302, -305(a)(1).

At trial, several witnesses, including Ms. Wagner, testified that appellant grabbed her by the neck, placed her in a headlock or choke hold, and forced her to walk down the street to his parked van, where he pushed her, against her will, into the van.  The evidence overwhelmingly supports appellant's knowing removal or confinement of Ms. Wagner and the interference with her liberty.

Appellant contests the element of "deadly weapon," relying on *State v. Morgan*, 415 S.W.2d 879 (Tenn. 1967).  In *Morgan*, our supreme court opined:

> "Weapons may be placed, generally, in two categories, namely: deadly per se, such as fire arms; and deadly by reason of the manner in which they are used.  It is generally recognized by the majority of the States that, a dangerous or deadly weapon is any weapon or instrument which, from the manner in which it is used or attempted to be used, is likely to produce death or cause great bodily injury."

*Id.* at 882 (internal citations and quotations omitted).  We agree that the stick is not a deadly weapon, per se.  However, the evidence at trial established that appellant used a large stick with knots on it to strike Mr. Hardy in the head repeatedly.  Appellant's attack on Mr. Hardy was thwarted only by Ms. Wagner's jumping on appellant's back.  The stick, as used by appellant, was likely to cause great or serious bodily injury.  Accordingly, we conclude that by its manner of use, the stick was a deadly weapon in this case.

Moreover, the trial court correctly instructed the jury that a "deadly weapon" means "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury or anything that in the manner of its use or intended use is

---

[5] The State indicted appellant for four counts of especially aggravated kidnapping and four counts of aggravated kidnapping involving Ms. Wagner based upon alternate theories of the offenses.  The jury found appellant guilty of only one count of especially aggravated kidnapping, which was count eight of the indictment.  Because all eight counts merged into the conviction for especially aggravated kidnapping, we limit our review to the facts establishing commission of that offense.

capable of causing death or serious bodily injury." *See* Tenn. Code Ann. § 39-11-106(a)(6)(A), (B). The properly instructed jury found that the evidence established by a reasonable doubt that the manner in which appellant used the stick rendered it capable of causing death or serious bodily injury. We will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379.

Appellant points out that the only contact with the stick that Ms. Wagner suffered was incidental. He also notes the Sentencing Commission Comment to Tennessee Code Annotated section 39-13-305, which states that "[i]f a weapon is in the defendant's possession but is not used, the kidnapping is punishable pursuant to § 39-13-304, aggravated kidnapping." Although Ms. Wagner stated that she was hit with the stick as appellant was "slinging" it with the intent to strike Mr. Hardy, that fact is inconsequential to our analysis. It was not necessary that appellant accomplish the offense of especially aggravated kidnapping by using the deadly weapon to strike Ms. Wagner; it was sufficient that he *displayed* the deadly weapon and that Ms. Wagner reasonably believed that it was a deadly weapon. Tenn. Code Ann. § 39-13-305(a)(1); *cf. State v. William Ferris*, No. W2003-01317-CCA-R3-CD, 2005 WL 1291261, at *10 (Tenn. Crim. App. May 31, 2005) (appellants accomplished the offense by arming themselves with guns and threatening the victim with the guns but did not discharge the weapons). Ms. Wagner testified that as appellant was hitting Mr. Hardy with the stick, she jumped on appellant's back to try to keep him from killing Mr. Hardy. Witnesses at trial testified that as appellant forced Ms. Wagner to walk toward his van, he was still in possession of the stick. Based on the evidence, a properly instructed jury found that appellant's display of the stick constituted display of a deadly weapon and that by his manner of use, Ms. Wagner reasonably believed it to be a deadly weapon.

Finally, with regard to especially aggravated kidnapping, appellant asserts that the evidence was insufficient because it did not establish that Ms. Wagner suffered serious bodily injury. However, a conviction for especially aggravated kidnapping may be predicated upon *either* serious bodily injury *or* use or display of a deadly weapon. Tenn. Code Ann. § 39-13-305(a)(1), (4). The statutory elements listed in subsection (a) are disjunctive. The State indicted appellant for use or display of a deadly weapon. *Id.* § 39-13-305(a)(1). Thus, the State was not required to prove that Ms. Wagner suffered serious bodily injury to sustain a conviction for this offense. Appellant is not entitled to relief on this issue.

## 2. Aggravated Assault

The jury found appellant guilty of two counts[6] of the August 4 aggravated assault involving Mr. Hardy that involved use or display of a deadly weapon. As charged in this case, the State must have proven beyond a reasonable doubt that appellant intentionally or knowingly caused bodily injury to Mr. Hardy or caused him to reasonably fear imminent bodily injury by use or display of a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(1), (2), -102(a)(1)(A)(ii).

Relying on our analysis set forth above regarding the element of a deadly weapon, we reiterate that a properly instructed jury found beyond a reasonable doubt from the evidence at trial that the manner in which appellant used the stick rendered it capable of causing death or serious bodily injury. We will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379.

Appellant also contests the sufficiency of the evidence on the basis that Mr. Hardy did not sustain serious bodily injury. However, a conviction for aggravated assault may be predicated upon *either* serious bodily injury *or* use or display of a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(A)(i), (ii). The statutory elements listed in subsection (a)(1)(A) are disjunctive. The State indicted appellant for use or display of a deadly weapon. *Id.* § -102(a)(1)(A)(ii). Thus, the State was not required to prove that the victim suffered serious bodily injury to sustain a conviction for this offense. We deny relief on this claim of error.

## C. Sentencing Issues

Appellant maintains that "there is no justification for the trial court to have sentenced him above the minimum sentence[,] and he should have received a sentence of fifteen (15) years." He also claims that the trial court failed to address the sentencing considerations set forth in Tennessee Code Annotated section 40-35-102.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any

---

[6] The third count of aggravated assault was based upon violation of an order of protection prohibiting appellant from having contact with Mr. Hardy or Ms. Wagner. However, the State dismissed that count of the indictment.

statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -210(b) (2010); Tenn. Code Ann. § 40-35-114 (2010 & Supp. 2012). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (2010 & Supp. 2012).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. § 40-35-114 (2010 & Supp. 2012); Tenn. Code Ann. § 40-35-210(c) (2010). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

As noted above, the trial court applied enhancement factor one, that appellant had a prior history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, and did not find any mitigating factors. Aside from these findings, the record is silent as to the trial court's other considerations.

Our supreme court has held that

> [m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]. . . . [W]hile "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority," there is no requirement that such reasoning be particularly lengthy or detailed." *Rita v. United States*, 551 U.S. 338, 356-57 (2007). Accordingly, . . . sentences should be upheld *so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed.*

*Bise*, 380 S.W.3d at 705-06 (emphasis added).

The trial court noted the enhancement factor that it applied and the lack of any mitigating factors. Obviously, the enhancement factor outweighed any mitigation. Because the trial court considered several of the statutory guidelines necessary to ensure proper sentencing, we surmise that it also, although not expressly, considered the remaining requisite statutory authority. Moreover, as set forth previously herein, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 710. Because the trial court imposed a within-range sentence that is "in compliance with the purposes and principles listed by statute," *Id.* at 709-10, we are bound to uphold its decision under our "abuse of discretion with a presumption of reasonableness" standard of review. Appellant is not entitled to relief.

## CONCLUSION

Based on the record as a whole, the arguments of counsel, the briefs of the parties, and applicable legal authorities, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE